## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Glenn Herr, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING IN PART AND** |
| | ) | **DENYING IN PART ZYLSTRA'S** |
| vs. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT; ORDER GRANTING** |
| Cornhusker Farms; James Husby, | ) | **LEAVE TO AMEND COMPLAINT** |
| individually; and Zylstra | ) | **RE PUNITIVE DAMAGES** |
| Investigations, LLC, | ) | |
| | ) | Case No. 1-15-cv-174 |
| Defendants. | ) | |

On December 10, 2015, plaintiff Glenn Herr initiated the above action against defendant Cornhusker Farms ("Cornhusker"), a general partnership between James Husby and Dennis Jones, both of whom reside in the Aberdeen, South Dakota area. (Doc. Nos. 30, pp. 6-7; 30-3, pp. 4-6). Also named as defendants are James Husby in his individual capacity and Zylstra Investigations, LLC. The latter is a one-person private investigation firm owned and operated by Laura Zylstra Kaiser, a former South Dakota state criminal investigator and a graduate of the University of South Dakota School of Law. (Doc. No. 41-1, pp. 4-6). For purposes of the discussion that follows, "Zylstra" will refer either to Kaiser or her investigation firm as the context requires, keeping in mind that Herr has sued only the latter.

In his complaint, Herr has asserted a number of claims arising out of: (1) Cornhusker having accused him of stealing a load of its soybeans in 2013 (an accusation Herr claims lacked any reasonable basis in fact); (2) Cornhusker, with the assistance of Zylstra, attempting to coerce payment for the soybeans with threats of bringing criminal charges; and (3), when that failed, Cornhusker, again with the assistance of Zylstra, causing a felony charge of theft to be brought

against him that ultimately was dismissed for lack of probable cause following a preliminary hearing. (Doc. No. 1).

Before the court now is Zylstra's motion for summary judgment seeking dismissal of the claims brought against it for: (1) negligence; (2) intentional infliction of emotional distress; (3) abuse of process; and (4) malicious prosecution. In considering this motion, the court's task is to determine whether there is a legal basis for the claims and enough evidence to allow them to go forward. In making these evaluations, the court must at this stage consider the facts in a light most favorable for Herr, including drawing all appropriate inferences in his favor. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Also before the court is Herr's motion to amend his complaint to request punitive damages. As discussed later, this motion is governed by N.D.C.C. § 32–03.2–11(1) and similarly requires an evaluation of the proffered evidence in the light most favorable to Herr.

## I.    DISCUSSION OF THE EVIDENCE FAVORABLE FOR HERR

### A.    The Cornhusker and Herr soybean operations

Husby and Jones started their farming partnership by renting land in Bowdle South. In addition to farming this land, Cornhusker also farmed additional acreage in South Dakota and North Dakota, including the acreage at issue in this case that Cornhusker rented from Lydia Herr in McIntosh County, North Dakota. This acreage is located approximately 13 miles southwest of Wishek, which is the closet town. Ashley, the county seat for McIntosh County, is located approximately 19 miles to the southeast. Cornhusker's "Wishek acreage" is adjacent to some of the land that Herr farms in the area with the assistance of his son. (Doc. Nos. 30 pp. 8-9; 30-3, p. 6; 31, p. 67; 33, p.28; 41-3, p. 4).

When Husby and Jones first rented the Wishek acreage in 2012, they sought the assistance of the Herrs to help farm it given its distance from their operation near Bowdle, some 60 miles to the south, and from Aberdeen where the two partners resided, which is somewhat further away. As is pertinent here, the Herrs did the spraying and much of the harvesting of Cornhusker's Wishek acreage for the 2012 to 2014 farming seasons. Also pertinent here is that Cornhusker and Herr both grew soybeans as part of their respective farming operations and, during 2013, the Herrs harvested both acreages. (Doc. Nos. 30, pp. 31 &39; 30-3, pp. 6-9; 41-2, pp. 5-8).

There is evidence that, when Herr harvested Cornhusker's soybeans, the beans would be loaded into trucks and transported the same day or the next to one or more elevators in the vicinity, some of which Cornhusker had pre-existing contracts with for sale of soybeans. The same was not necessarily true for Herr's soybeans since he had on-farm storage. (Doc. Nos. 30, p. 12; 41-3, p. 11). Hence, any of beans that Herr might deliver to the elevator may have come either from the fields as the beans were being harvested or may have come from onsite storage.

**B.** **The November 2014 call by Husby and Jones accusing Herr of converting a load of soybeans harvested in 2013**

After the 2014 harvest, Husby and Jones had a phone conversation with Herr that November to discuss the spraying bill that the Herrs had presented to Cornhusker for spraying in 2014 as well the amount owed by Cornhusker for use of certain of their equipment. During this conversation, Husby and Jones claimed that Herr had misappropriated a load of Cornhusker's soybeans the year prior during the 2013 harvest. More specifically, they claimed that a load of soybeans that Herr had delivered on October 30, 2013, to the North Central Farmers Elevator in Hague, North Dakota (the "Hague elevator") and deposited in his name came from Cornhusker's soybean acreage and not his own. (Doc. Nos. 30, pp. 14-15; 32, pp. 23-24, 32-33; 30-3, pp. 8-9; 43; 41-2, p. 7; 43, Herr call

001).

There is evidence that, for Herr, this accusation of theft in November 2014 of a load of 2013 soybeans - more than a year after the delivery of the load in question and after the intervening 2014 harvest - came out of the blue. Relevant later is that there is some evidence that, during this phone conversation, Herr may have stated, without the benefit of looking at records and having time to reflect on the matter, that he completed the harvest of his soybeans on October 27, 2013, before starting on the same date on the Cornhusker acreage. (Doc. Nos. 30, p. 19; Doc. No. 43, Herr call 001). As discussed later, Herr later told Cornhusker's investigator prior to any criminal charge being brought that he had concluded after a review of his records that, while he had finished the bulk of his soybean harvest prior to starting on Cornhusker's acreage on October 27, there was one field that he did not finish until the morning of October 30.

What may be of particular concern to a jury in this case are two points about the timing of the initial November 2014 phone call. One is the fact that it did not come until after the Herrs had presented Cornhusker with their bill for 2014 spraying, which Cornhusker disputed and to date has not paid. The amount of this bill was approximately $15,000, slightly more than the value of $14,000 that Cornhusker placed on the load of soybeans that it accused Herr of stealing. Second, despite professing to have believed that Herr had stole a load of its soybeans, Cornhusker not only did not report the suspected theft to authorities at that time, it continued to employ the Herrs to do their 2014 spraying and assist with the harvest of the 2014 crop. (Doc. Nos. 30, pp. 47; 32, pp. 23-24, 42-43; 30-3, pp.8-9; 43, Herr call 001).

**C.** **Cornhusker's retention of Zylstra and the questionable "evidence" provided by Husby and Jones**

When Herr would not acknowledge that the October 30, 2013 load of beans belonged to Cornhusker, Husby and Jones retained Zylstra. A jury could conclude from the evidence that follows that Zylstra was engaged not to conduct an independent investigation as to whether Herr actually stole the soybeans, but rather to put together in a package the "evidence" that Husby and Jones believed could be used to pressure Herr with a claim of theft.

Husby and Jones first met with Zylstra at a Perkins restaurant in Aberdeen, South Dakota on December 1, 2014. During this meeting, Husby and Jones turned over some (but not all) of the certificates evidencing the deliveries of soybeans that had been harvested from Cornhusker's acreage by the Herrs in late October and the beginning of November 2013. The certificates that Husby and Jones turned over were for deliveries to the Northern Plains Cooperative Elevator at Venturia, North Dakota (the "Venturia elevator"). Husby and Jones also outlined for Zylstra why these grain certificates along with other information that they claimed was true demonstrated that the load of beans that Herr delivered to the Hague elevator on October 30, 2013, came from Cornhusker's fields. The "evidence" that appears to have been provided by Husby and Jones to Zylstra was the following:

- Husby's assertion that Herr had completed the harvest of his own soybeans on October 27, 2013, some three days prior to the October 30 load being delivered to the Hague elevator.

- Husby's claim that a widespread precipitation event blanketed the area with an inch or more of rain that began on the evening of October 28, 2013, and continued for most of the next day. According to Husby, this precipitation event caused the

moisture levels of the first load of soybeans harvested after the 28th and 29th to have a higher moisture content than the soybeans harvested on October 27-28 from Cornhusker's fields and, since the load delivered by Herr to the Hague elevator on October 30 had the same moisture content as the loads that were delivered from Cornhusker's fields on October 28, that load must have come from its fields.[1]

- Husby's claim that a semi-truck full of soybeans that Cornhusker's hired hand, Miles Grein, claimed to have remembered seeing parked at the Herr farmstead at about noon on October 28, 2013, was likely the load of beans that Herr delivered to the Hague Elevator two days later.[2]

- Husby's suspicion that Herr may have committed other acts of theft of its harvested crop including a load of 2012 corn and maybe more soybeans harvested in early November 2013 after the load in question. Also, because of the number of weeds in some of their fields, he suspected that the Herrs may have been shorting Cornhusker on the amount of chemical being applied when they sprayed.

(Doc. Nos. 30, pp. 13-27; 31, pp. 94-122; 30-3, pp.9-10; 41-1; 43, Herr Calls 001 & 004).

For all of these things, Husby and Jones had no firsthand knowledge because neither of them were around when any of the alleged events took place. (Doc. Nos. 30, pp. 13-27; 31, pp. 87-88;

---

[1]    When Husby made the claim that the October 30 load must have come from Cornhusker's fields because its moisture content was not consistent with the alleged large intervening precipitation event, he ignored the very real possibility that the October 30 load may have come from Herr's storage since there is evidence that Herr at times blended his harvested soybeans with soybeans in storage to control the moisture content of the delivered soybeans. (Doc. No. 43, Grein call). As discussed more fully later, Herr later determined after putting his records together that the October 30 load came from the harvest a field that he had started combining on October 27 but did not complete until the morning of October 30.

[2]    October 28, 2013 was a Monday. Husby offered no explanation for why the Herrs would leave a load of soybeans in their truck until October 30, particularly given his claims about the weather.

30-3). As for Grein, Cornhusker's hired hand, his firsthand knowledge was also limited. The Herrs started combining the field of Cornhusker soybeans in question on October 27. Grein, who also was from South Dakota, did not arrive with his semi to help haul the harvested Cornhusker soybeans until the 28th. Grein worked that day hauling several loads of soybeans as the Herrs completed the harvest of the field in question and returned to South Dakota that evening. Hence, his firsthand knowledge was limited to what he saw on the 28th. In addition, as discussed later, he had his own personal issues with Herr. (Doc. Nos. 30, pp. 13-27; 43, Grein call).

For reasons discussed in more detail later, a jury could conclude from the evidence now before the court that there was no reasonable basis in fact for what Husby and Jones told Zylstra (and Husby later repeated to the court) and that their theory for why the October 30 load of soybeans belonged to them was offered in reckless disregard of the truth if not with a purposeful intent to deceive. As will be discussed later, state district court Judge Narum ultimately concluded that Cornhusker's "evidence" that Herr had stolen the October 30 load of beans lacked probable cause.

### D. Evidence that Cornhusker did not turn over to Zylstra or to law enforcement

In addition to the problems with the "evidence" supplied by Husby and Jones, it now appears clear that they did not turn over to Zylstra or later to law enforcement authorities certain information that they had in their possession that a jury could conclude was damning to their claim that Herr had stolen the October 30 load of soybeans. More particularly what appears not to have been turned over is two sets of information.

The first set was: (1) *all* of Cornhusker's elevator certificates for loads of soybeans that were hauled and deposited in Cornhusker's name for what was harvested on October 27 and 28; (2) information identifying the particular field of Cornhusker beans that had been harvested on the 27th

and 28th and the number of planted acres of soybeans in that field; and (3) the information that Cornhusker possessed with respect to what yields were being achieved from that field. The relevance of this kind of information is readily apparent. If the total pounds of soybeans for all of the loads that were hauled and deposited in Cornhusker's name roughly matched what was expected based on the number of planted acres and the apparent yield, then there would likely not have been a missing load of soybeans for the acreage harvested on October 27-28.

While Husby and Jones did turn over to Zylstra three of the delivery tickets for soybeans harvested from its acreage on those two dates - one ticket for a load delivered by Herr on the morning of the 28th for soybeans harvested the day prior and two tickets for loads delivered by Grein on the 28th - all of which were delivered to the Venturia elevator, it did not turn over to Zylstra, the BCI, or McIntosh law enforcement authorities the delivery ticket for the last load of the day that was delivered by Grein to an elevator in Wishek ("Wishek elevator"). During the preliminary hearing, Herr's attorney presented evidence that, with this last load of soybeans, it appeared that all of Cornhusker's harvested soybeans had been accounted for and that, if the October 30 load was added to that, this would have resulted in a yield substantially in excess of what the evidence showed the soybeans had been running. Judge Narum found his evidence to be compelling. (Doc. Nos. 30, pp.17-25; 31, pp. 50,-51, 89-92; 41-1, pp. 15-17).

The second set of information that Cornhusker had available to it that was not turned over to Zylstra, or anyone else, is what it had itself had sworn to under oath as having been the amounts of soybeans harvested from the field in question on October 27-28. There is evidence which suggests that, when this information is also compared to the total amounts of soybeans that were delivered and deposited in its name, including the amount of the load for the ticket it had not

disclosed, that all of the soybeans that possibly could have come from Cornhusker's acreage on the 27th and the 28th were delivered to elevators and deposited in Cornhuskers's name. (Doc. Nos. 36; 36-1). This evidence only came to light when Herr was able to obtain discovery with respect to Cornhusker's crop insurance records and is in addition to that which was considered by Judge Narum.[3]

**E.      Zylstra's "investigation"**

Following the initial meeting with Husby and Jones, Zylstra proceeded to make contact with the Sheriff of McIntosh County to inform her of the theft investigation and get the lowdown on Herr. Zylstra then conducted telephone interviews with Grein, Cornhusker's hired hand, and the owner of the land that Cornhusker was renting. The purpose of these interviews appears to have been to document what Husby and Jones claimed would be the evidence that would support their theory for why the October 30 load of beans belonged to Cornhusker. Zylstra also called the elevators in Hague and Venturia but obtained no more records, prepared a spreadsheet summarizing the grain certificates issued by the elevators, and did internet research on the weather for Wishek for the time period in question.

The internet research that Zylstra performed and sent to Cornhusker with rest of the above information has not been made a part of the record here. However, as discussed in more detail later, information was presented at the preliminary hearing that had been gathered from the National Oceanic & Atmospheric Administration ("NOAA") and a North Dakota NDAWN reporting site that

---

[3]  While these two sets of information were not turned over to Zylstra, there is no evidence that she even thought about comparing the number of pounds of soybeans that had been delivered and deposited in Cornhusker's name to the number of soybean acres harvested on the 28th-29th and what Cornhusker's records and other evidence suggested was the yield off that field. Hence, it not clear that had *she* been presented with the certificate for the load of beans delivered by Grein to the Wishek elevator and Cornhusker's crop insurance records she would have done anything different.

belies Husby's statements to Zylstra and others (including to the state court when he swore out the criminal complaint) about the intensity and widespread nature of precipitation that he claimed blanketed the area in question on October 28-29 and that was critical to his theory for why the October 30 load of soybeans had to have come from Cornhusker's fields. Also, when BCI Agent Kelly conducted similar weather research, the results he obtained were similar to the information presented at the preliminary hearing, which did not support Husby's weather claims. Based on the information currently before the court, a jury could conclude that Zylstra, who held herself out to be a trained and experienced investigator, would have reviewed the same sources and discovered that what Husby had claimed his research showed with respect to the weather was at best questionable if not outright wrong. Further, the jury could be concerned about the fact that, when Zylstra turned over information to the McIntosh State's Attorney, she did not include her weather research, or, even if she had not kept a copy, at least included a statement about what that research showed and did not show.

**F.** **Further contact by Cornhusker with McIntosh law enforcement and a plan to pressure Herr into paying for the October 30 load of soybeans**

In addition to Zylstra making contact with the McIntosh County Sheriff, there is evidence that Cornhusker did the same and this led to a discussion with the Sheriff about Cornhusker holding off on pursuing formal charges to see if it could convince (or as the jury might conclude impermissibly coerce and pressure) Herr into paying up. (Doc. No. 43, Herr call 001 at ~ 00:01:00 & ~ 00:40:00). Further, there is evidence that, to this end, Cornhusker and Zylstra developed a strategy for exerting maximum pressure on Herr to pay, which was to have Zylstra call Herr on the morning of April 7, 2015, to communicate the following: (1) things were not looking good for him based on Zylstra's "investigation" and her professional experience as a criminal investigator; (2) that

both Zylstra and Cornhusker had already been in contact with the Sheriff's office, leaving the subtle impression that McIntosh law enforcement was ready to proceed on the criminal front; and (3) that he would have until 2:00 p.m. that day to commit to paying for the beans in question or criminal charges would be sought and likely would follow. (Doc. No. 43, Herr calls 001-006, numerous statements). This is also consistent with Husby purportedly having told BCI Agent Kelly that the purpose of retaining Zylstra was to "see if they can get [Herr] to crack." (Docket No. 30-4 p. 4) (quoting an interview between Husby and Troy Kelly on June 3, 2015).

### G.     <u>Zylstra's April 7, 2015 phone conversations with Herr</u>

Zylstra called Herr on April 7, 2015, and that call resulted in five more calls that same day.[4] During the six phone calls, Zylstra did convey Cornhusker's theat that it would proceed with criminal charges if Herr did not commit to paying up by 2:00 p.m., which was later extended to later in the day when Zylstra's phone discussions with Herr became drawn out. Zylstra did indicate to Herr that, based on her investigation and prior law enforcement experience, things did not look good for him. Zylstra also emphasized that both she and Cornhusker had already been in contact with the Sheriff and implied that the Sheriff was on board and ready to proceed with charges. (Doc. No. 43, Herr calls 001-006, numerous statements). More particularly with respect to the latter, Zylstra at one point stated:

> [Husby] has talked to the Sheriff, I have talked to the Sheriff and its all lined up, its basically a phone call away . . . .

(Doc. No. 43, Herr call 001 at ~ 00:56:30). At another point she talked about "*calling off* the sheriff and putting it [the criminal process] on the backburner . . . . " (<u>Id.</u> at ~ 1:22) (italics added). Then,

---

[4] Zylstra recorded each of the phone calls. There is no indication from the record here that she made Herr aware of this fact or that he was otherwise aware the calls were being recorded. While not unlawful, a jury might take a dim view of Zylstra not telling Herr in advance that she was recording the calls given the circumstances.

a little later, she stated that Husby "feels confident in talking with the Sheriff and having the documentation that he has" that a charge of theft would prevail. (Id. at ~ 01:45:30).

In addition, Zylstra made other statements to Herr during the course of the conversations on April 7 that a jury might also conclude were impermissibly threatening and coercive, particularly in the context in which they were delivered. These included:

- Zylstra telling Herr that the mere bringing of the criminal charge would irretrievably damage his reputation, even if he later proved his innocence, including stating that once a criminal charge is brought:

> then you are going to be arrested, then you are going to be booked in, then you are going to have it all over the newspaper - the whole world is going to know. And, there is no stopping it. A lot of times people will remember that you were arrested; people don't ever remember the outcome of the case. People don't get that. It is pretty hard to take that back - innocent or not. That stigma stays with a person.

(Id. at ~ 01:39:20) (interjections by Herr omitted).[5]

- Zylstra multiple times emphasizing the severity of the criminal charge and that he may be facing jail time. For example, at one point she stated that the theft of the soybeans in question would be a Class B felony punishable by imprisonment for up to 10 years, a fine of up to $20,000 fine, or both - a "serious deal." (Id. at ~ 00:47:25). Also, at another point she stated that Husby's position was that "you take this offer [Husby's offer to forgo seeking criminal charges if Herr agreed to pay up] or pay the money [as result of being found guilty] and *be looking at felony time*." (Doc. No 43, Herr call 004 at ~ 00:04:25) (emphasis added).

---

[5] With this statement, Cornhusker and Zylstra may have a difficult time explaining to the jury why Herr's reputation has not been damaged if Herr is able to prove liability.

- Repeatedly emphasizing to Herr that he would facing an arrest if criminal charges went forward.  For example, in addition to the statement set forth above, Zylstra stated at another point during the first conversation that if "charges will come out, a warrant of for your arrest will come out and then you have to prove your innocent [sic] in court."  (Doc. No. 42, Herr call 001 at 01:38:20).  Then later she stated in another call that Husby's position was that it was "not going to be so good a situation for you if he goes forward though the court system and deal with the arrest and all that stuff."  (Doc. No. 43, Herr call 004 at ~ 00:18:00).

- Zylstra telling Herr that, if things were not resolved that day, there likely would more than just the one load of beans involved, that everything would be gone through going back to 2012, and that he might very well have to face multiple felony charges as a result. At one point during the first call, she stated:

  > His [Husby's] intent if it goes to the Sheriff's office, if it gets to that point, he wants everything to be combed through going all the way back to 2012, going through corn, going through beans, going through everything . . . .

  (Doc. No. 43, Herr call 001 at ~ 00:29:30).  Then, after Herr asking whether Husby was claiming there were other thefts.  She responded:  "That is what he is saying."  (Id. at ~ 00:30:31).  This was followed shortly by:

  > Next step would be is to have subpoenas issued to all of the grain elevators -- you know -- anywhere grain or beans -- anywhere it could have been  -- subpoenas back to 2012 . . . .

  (Id. at ~ 00:31:30).  Then a little later:

  > I wouldn't -- I wouldn't be calling to talk with you here if I did not think there was an issue.  * * * * I would have backed out of the investigation if I did not think there is something here. * * * * And you know I have seen it -- and um I am not accusing you here -- but what I have seen  in law enforcement if there is an issue as far as a

theft, that it is not one time. * * * * But if it happened once, it probably happened twice.

(Id. at ~ 00:46:00). And still later, if the criminal process goes forward:

I mean a Class B felony. And possibly multiple. I mean that that's the thing. It won't be just this one issue looked at. If there's other discrepancies - you know . . . .

(Id. at ~ 01:40:20). Finally, in the fourth call after Herr complained that what was going on amounted to extortion, Zylstra stated in response:

And, well, he [Husby] feels there this isn't the one time, there is the October 30th, he feels there is another issue on November 4, and he thinks in going back there is going to be other issues.

(Doc. No. 43, Herr call 004 at ~ 00:17:36).

• Telling Herr he would have no civil recourse if he was wrongly charged because Husby would be protected by the fact that the prosecutor will have brought the charge and the prosecutor, in turn, would have immunity. (Id. Herr call 001 at ~ 01:41:20).

• Finally, during the last phone call on June 7 after Herr stated he could not agree to what Husby was proposing and that it felt like extortion, Zylstra stating the following:

Well *I will go forward* then with information that we have talked about today and just share that with the Sheriff and it doesn't look good. * * * * As far as all the evidence and where *we* are at, it does not look good for you.

(Doc. No. 43, Herr call 006 at ~ 00:01:40) (emphasis added). And then after Herr again stated he believed this to be extortion on the part of "you guys" [meaning Cornhusker and Zylstra] and that he could not agree, Zylstra stated in one last attempt:

14

> Ok, he [Husby] just wanted to pass on that he will be meeting with the Sheriff tomorrow then.

(Id. at ~ 00:02:50).

## H. Subsequent communications with McIntosh County law enforcement

Notwithstanding the repeated assertions by Herr during the April 7 phone calls that his paperwork would prove his innocence and his begging that at least Zylstra meet with him to discuss that information, Husby and Jones both went to the courthouse in Ashley the next day and met for a couple of hours with the Sheriff and the State's Attorney. There Husby presented a handwritten statement of Cornhusker's theory for why the October 30 load of soybeans belonged to it. Husby and Jones also turned over the copies of the elevator certificates that they claimed supported their theory of theft of the October 30 load of soybeans but did not include the elevator certificate for the last load of soybeans that was delivered and deposited in Cornhusker's name by Grein on October 28, which was at the Ashley elevator. (Doc. Nos. 30, pp. 23-25; 33).

Also the next day, Zylstra prepared a written summary of her first two-hour telephone conversation with Herr on April 7. And, just as she stated to Herr that she would do if the matter was not settled, she forwarded that report to the State's Attorney along with copies of the recordings she had made of the telephone calls. (Doc. No. 41-1p. 20). Notably, she did not forward to the State's Attorney her weather research or a summary of that research.

Zylstra takes the position that there was nothing that she did that was a material factor in the bringing of the criminal charge against Herr. There is, however, substantial evidence upon which a jury could conclude otherwise.

First, in the written summary of the first conversation, Zylstra highlighted a number of points in italics. A jury could conclude based on what she highlighted that her purpose for doing so was

to emphasize for Cornhusker and McIntosh law enforcement what she considered to be indicia of Herr's guilt and implicitly that she supported the bringing of a criminal charge.

Second, one of the pieces of "evidence" that Husby offered in his *ex parte* testimony in support of the complaint and that he and Zylstra repeated during the preliminary hearing was Herr's offer during the April 7 conversations with Zylstra to forgo payment of the spraying bill in order to settle matters. When Husby continued to demand payment for the soybeans, Herr then offered to pay for the soybeans if Cornhusker would at the same time pay the spraying bill, which, essentially, was the same thing since the spraying bill was roughly equal to what Husby was claiming the load of soybeans was worth. A jury could conclude that Cornhusker and Zylstra "manufactured," so to speak, this allegedly inculpatory evidence by the pressure they exerted on Herr - particularly Zylstra's statements during the April 7 telephone calls that a jury might very well conclude were oppressive and beyond the pale in the context in which they were made.

Third, the jury could conclude that Zylstra's preparation of a summary of only the first conversation - italicized passages and all - coupled with the failure to explicitly caution the recipient of the tapes that all of them needed to be listened to, if she was not going to summarize the remaining conversations, resulted in materially incomplete information being conveyed to Judge Narum when he approved the initial complaint. This is particularly true for what was presented and not presented to Judge Narum with respect to what Herr had stated as to the date on which he had finished harvesting his own soybeans. This point will be addressed in more detail later.

Finally, in forwarding to the State's Attorney evidence that Husby and Zylstra considered damning, a jury could also be troubled by her failure to have provided the State's Attorney with a summary of what she found or more likely did not find with respect to weather for the reasons expressed earlier.

## I. The BCI investigation

In late May 2015, the McIntosh Sheriff requested that the BCI look into this matter. The investigation was assigned to BCI Agent Troy Kelly. After reviewing documents that Husby had provided to McIntosh law enforcement, the first thing that Agent Kelly did was to contact Husby to confirm that he still stood by what he had stated in the handwritten statement he had provided to the Sheriff and the State's Attorney, which, essentially, was a summary of what Husby had earlier conveyed to Zylstra. (Doc. Nos. 31, p. 15; 33).

Agent Kelly also obtained elevator records from the Hague elevator, the one used by Herr for the delivery of the October 30 load. He did not get any records from the Venturia elevator for Cornhusker's loads, since those had already been provided by Husby to the Sheriff and the State's Attorney, and he did not obtain any records from the Wishek elevator because Husby did not advise that part of their soybeans harvested on October 28, 2013, had been delivered to that elevator. (Id. at 19-21, 49-53).

Agent Kelly next conducted interviews of Grein, Cornhusker's hired hand, and Herr. In addition, he conducted internet research with respect to the weather but did not document it. (Id. at 31-39, 43-47). As will discussed later, the results of Agent Kelly's internet research did not support Husby's claims with respect to the weather. Also, while it may be that the BCI investigation was a factor (but likely not the exclusive one) in the State's Attorney's decision to support the prosecution, it appears not to have been a factor in Judge Narum's decision initially to allow the criminal process to proceed since Agent Kelly did not prepare an affidavit or present testimony in support of the complaint.

## J. Husby swearing out of the criminal complaint for theft and the court's initial determination of probable cause based on testimony from Husby

On July 23, 2015, Husby swore out a complaint charging Herr with the offense of theft of property of a value in excess of $10,0000, which is a Class B felony under North Dakota law. (Doc. No. 4). Initially, the only evidence that was proffered in support of the complaint was a very short and conclusory affidavit completed by Husby. (Id.). When Judge Narum determined that to be insufficient, testimony was given by Husby in support of the complaint during an *ex parte* proceeding. (Doc. No. 41-3). No other testimony, either oral or by affidavit, was given. In short, the court relied only upon what Husby presented in concluding at that point there was probable cause for the commencement of the criminal process. (Id.).[6]

### K.    The preliminary hearing and the dismissal of the theft charge for lack of probable cause

A preliminary hearing was held on November 2, 2015. The State called as witnesses BCI Agent Kelly, Zylstra, and Husby. Herr's attorney called his Herr's son to testify. Also, Herr's attorney introduced weather data that a jury could conclude in this case rendered Husby's claims about the weather and what he contended was its consequences unreliable. Further, Herr's attorney introduced acreage and yield information for the Cornhusker field that was harvested on October 27-28 together with the evidence of the total quantity of beans that had been harvested from that field and deposited in Cornhusker's name, including the previously undisclosed grain certificate for the load of soybeans that Grein had hauled on October 28 and deposited at the Wishek elevator.

At the conclusion of the hearing, Judge Narum concluded there was not enough evidence to support a finding of probable cause to allow the charge of theft of the October 30 load of soybeans to go forward. And, while this was all that Judge Narum needed to decide in order to dismiss the charge, he went on to observe that, insofar as he was concerned, Herr had proved by at least a

---

[6]  It is not clear why the complaint was sworn out by Husby and not BCI Agent Kelly or the Sheriff.

preponderance of the evidence that the October 30 load of soybeans belonged to him and not Cornhusker. Further, Judge Narum agreed with Herr's counsel that Cornhusker's actions raised legitimate concerns about whether it had committed criminal coercion.[7] More particularly, the court stated:

> In this particular case, when this matter was initially ex parte submitted , I sent it back and I said there isn't enough evidence here to support the allegation.
>
> * * * *
>
> After I sent the case back to the prosecutor I took testimony, which has been subsequently provided to the defendant, and yet that again is on an ex parte basis. And while I believe at that point this case as a criminal matter was razor thin, I found that there was probable cause to support the complaint.
>
> Now , having had t he opportunity to take in the evidence with the defendant having his right to cross examine today and also with the defendant having his opportunities to submit evidence, I think that, as I pointed out to the prosecutor during his closing argument, it appears to me that we have all of the Cornhusker grain accounted for. And notwithstanding, and the defendant has no burden to submit any evidence whatsoever, I think Defendant's Exhibit 29 and Defendant's Exhibit 32, if I were sitting here today in a civil proceeding , I would find that this defendant has met his burden of preponderance the opposite way. Now that's  not the burden before me today. The burden is to determine whether or not the prosecution has established probable cause to believe that theft, as alleged in the complaint, has been committed by this defendant. And I frankly agree in part with what Mr. Myerchin has said, this case is a rare case and I leave no criticism for the investigators. There ' s - - they sent forth to the prosecutor and to law enforcement what they had.
>
> I think the conversation we had today about Mr. Herr in negotiating and that can be considered by me to be evidence of a guilty mind. In this case I think, after a long pause, we're another harvest into a farmer's life, he is in the situation where he's being accused of a very serious crime and he's negotiating essentially blind. *He's being threatened, and I think the statute that you cited regarding criminal coercion, I think that's a legitimate concern. That is crossing my mind as I'm hearing the testimony is they're saying; you pay me this much by this time or I'm going to the authorities and you're going to go to jail.* And whether those were the exact words or not I don't know and I'll never know, but I am not going to sit here and consider that as evidence of a guilty mind when in all other aspects of the evidence that I have received over a great deal of testimony today don't amount to probable cause. Notwithstanding what the defendant himself submitted without the obligation to submit evidence again.

---

[7] While Judge Narum stated he did not include the investigators in making that assessment, it does not appear he had before him the full scope of the statements that Zylstra had made to Herr as set forth in the tapes of the six phone conversations.

So I find absolutely there is not probable cause to support the complaint in this case. The matter is dismissed.

(Doc. No. 32, pp. 55-56).

As discussed later, Zylstra places particular reliance upon the fact that Judge Narum initially concluded there was probable cause for the complaint. In terms of this case, there is evidence from which a jury could conclude that Judge Narum was simply wrong when he found there was probable cause initially. Also a jury could conclude that the initial finding of probable cause was based in substantial part that upon: (1) testimony given by Husby that was rendered unreliable based on information that he and/or Zylstra possessed and failed to disclose; (2) testimony for which there was no good faith basis in fact if not outright purposefully deceptive; and (3) evidence that was generated in part by the pressure exerted upon Herr by Husby with Zylstra's assistance.[8] These points will be addressed more fully in what follows next.

**L.** **What the jury could conclude were the problems with what Cornhusker was claiming and why there was not probable cause** .

**1.** **Husby's testimony that Herr's October 30 load of beans must have come from Cornhusker's acreage because of the weather**

In his *ex parte* testimony in support of the criminal complaint, Husby claimed that the precipitation event that hit the area in question was "all night [the 28th] and I think next day event." He testified he had "went back through NOAA and got kind of the amounts and there was roughly an inch of precipitation across the area." (Doc. No. 41-3, p. 12). Then, at the preliminary hearing in response to questions by the State's Attorney, Husby testified that on the evening of October 28, he observed on the radar a large weather system that blanketed the area. (Doc. No. 31 at p. 84). He

---

[8] While the court here makes reference to the jury, it has not yet resolved whether the jury will make the determination based on instructions from the court as to what constitutes probable cause or whether the court will make the determination after submitting special interrogatories to the jury with respect to contested factual issues.

20

claimed he had personally researched the amounts of precipitation and then, without any supporting

documents, testified as follows:

> Q: Do you know how much rain or snow Wishek got?
>
> A: Between the area an inch to two.
>
> Q: Of snow.
>
> A: Yes. Rain a lot of it came in rain, but there was, yeah, sleet and stuff like that.
>
> Q: You don't know how many -- do you know how many inches of moisture, actual moisture rain or liquid --
>
> A: From what I found with NOAH [sic] with their observations and stuff in the Ashley area, there was around an inch and northwest - -
>
> Q: Where did you get that information from?
>
> A. I called the NOAH [sic] service.
>
> Q: Did you get anything in writing on that?
>
> A: I wrote it down on some paper and stuff of my own and they just -- they gave me some of their local spotters that they have gave me their totals and stuff through that.

(Id. at p. 85). Then, upon cross-examination, he further testified:

> Q: Okay. Now you're telling us -- you testified here earlier that this -- you called NOAH [sic] and they confirmed that the Ashley area got an inch, inch and half of precipitation.
>
> A. Mm-hmm.

(Id. at p. 101).

Based on the current record, the jury could conclude not only that there was no evidence to

support Husby's claim of a large precipitation event that blanketed the area, but also that some of

what he claimed, including that he had checked with NOAA, was simply made up or, at the very

least, testified to about in reckless disregard of the truth, given its apparent inaccuracy. Notably,

the actual documentary evidence from NOAA for Ashley for the period of October 28-29, which

was introduced during the preliminary hearing, shows that it received only 1/100th (0.01) of an inch of rain and a ½ inch of snow (and, of course, the moisture content of snow is far less than rain) - far less than what he claimed Ashley had received based on his purported checking. (Doc. No. 33, p. 14). In addition to that, there is the evidence from the Wishek observation station that is part of North Dakota's NDAWN system. It is located approximately four miles west of Wishek and is the closest weather observation point to the area in question. The documentary evidence from that station reported *no* precipitation on the 28th and 29th. (Id. at 22-23; Doc. No. 32, pp. 2-3).

The evidence from the actual weather records was further bolstered by the testimony given during the preliminary hearing by BCI Agent Kelly when he was subject to cross-examination. He testified as follows:

BY MR. MYERCHIN:

Q:    Now in looking through your case file, I didn't see any weather reports in your case file.

A:    No, sir.

Q:    And you, in fact, you never verified that there was this claim of a large storm system. Correct?

A:    I did some research on the internet through various sites. Depending on which weather station or report you got from, none of them were consistent; some showed no precipitation, some showed some precipitation, some showed minuscule amounts of precipitation. I assume, I'm obviously not a weather forecaster or a meteorologist, but I would suppose specific to that area could fluctuate, you know, 10- 15 miles from wherever their records are obtaining that data. So it was tough to say; some showed that there was precipitation in the area, some showed there was none.

Q:    And yet you didn't go and secure Ashley NOAH weather records.

A:    I did not maintain any records from any of the sites that I searched.

(Doc. No. 31, at p. 52).

The significance of all of this becomes readily apparent when one considers an exhibit

presented at the preliminary hearing showing the location of NDAWN's Wishek observation point relative to (1) Cornhusker's soybean acreage, and (2) Herr's "gumbo fields." (Doc. No. 33, p. 28).



In the diagram, the Cornhusker soybean acreage is located next to the block that is labeled "Glenn Herr," which depicts a part of his farm. The acreage that Herr tried to explain to Zylstra during the April 7 phone calls as being the source of the October 30 soybean load in question is what has been labeled as Herr's "gumbo fields." Herr's son testified during the preliminary hearing that, while he and his father had started combining this acreage on October 27, they did not complete it until early on the morning of October 30 while the ground was still somewhat firm from the cold conditions of the night before and that the October 30 load that Cornhusker claimed they stole came from that acreage. (Doc. No. 32, pp. 8-15, 26-27, 141). Not only are the gumbo fields several miles distance

from Cornhusker's acreage but they are also closer to the NDAWN Wishek reporting station that reported no precipitation on October 28-29.  (Id. at 5-7; Doc. No. 33, p. 28).

While there is evidence that Cornhusker's soybean acreage did get *some* precipitation on the evening of the 28th and there was some delay in the completion of the harvest of *those* fields, it is perfectly consistent with the varying intensity and uneven nature of the reported precipitation that Herr's gumbo fields got little or no precipitation, which is what the Herrs have claimed  Further, given the lack (or lesser amount) of precipitation, differing terrain and ground conditions, and a day to dry, it would be sheer to speculation to conclude that the moisture content of the October 30 load would have had to have been higher if it had been combined that morning from Herr's gumbo fields and that the soybeans could only have come from Cornhusker's acreage harvested on the 28th.[9] Further, this putting aside whether Husby has the necessary credentials to render an opinion with respect to what the moisture content would have had to have been as well as the necessary foundation information given all of the factors that might come into play.

> **2.** **Husby's testimony that Herr finished the harvesting of his beans on October 27**

Husby was also asked by the State's Attorney during his *ex parte* testimony in support of the complaint when Herr finished the harvest of his soybeans.  More specifically, the line of questioning went as follows:

> Q:      Also you had - - you had read the investigator's report concerning her interview with Glenn Herr.
>
> A.      Yes.
>
> Q.      And in that report he admitted that he was done with his crop on the 27th. Right?

---

[9]  It appears the moisture content delivered to the Hague elevator on October 30 had approximately the same moisture content as soybeans the Herrs stated they harvested from the gumbo fields on the 27th.  (Doc. No. 32, pp. 22-23).

A.     Yes.

(Doc. No. 41-3, p.11).

The problem with this testimony is that a jury could readily conclude it was at best reckless if not out right purposefully deceptive.  In order to understand why requires some additional context. As noted earlier, there is some evidence that Herr may have expressed a belief during the November 2014 phone call with Husby and Jones that he may have completed the harvesting of his soybeans on October 27, 2013.  However, there is also evidence that  he had been caught cold by the phone call from Husby and Jones and did not have his records in front of him when he made that statement.

With that, Zylstra's report did not state that Herr admitted that he completed the harvest of his soybean acreage on October 27.  What the report actually stated was the following:

> I also told him that I was aware he told Cornhusker he was done combining on the 27th of October to which Glenn responded "*yeah*."  Glenn went on to say that he looks forward and not backward but admitted "*it could be, maybe I did say that*."  Glenn said in the meantime, after he talked to Cornhusker last fall, then he created a timeline and prepared a folder containing all of his tickets.  Glenn said he wouldn't know when he was done combining without looking in his file, therefore he couldn't say if the 27th was correct or not.  I told him that was fine.

(Doc. No. 30-1, p.2) (italics in original).

Moreover, a jury could conclude that even this summary was not accurate in terms of what Herr said to Zylstra when all of what he told her on April 7 is considered.  When Zylstra first called Herr on April 7, 2015, the  tapes reflect that Herr was again caught cold and did not have his file in front of him during the first conversation when Herr purportedly stated what Zylstra set forth in the above summary.  After the first conversation, however, Herr had the opportunity to retrieve his file, review his records, and consult with his son.  In later calls on April 7, Herr told Zylstra more than once that his records reflected that they did  not complete the harvest of their soybeans until October 30.  (Doc. No. 43, Herr call 002 at ~ 00:13:36; 003 at ~ 00:04:35). In fact, during the second call,

Herr explained in detail that, on the morning of October 30 while the ground was still somewhat firm from the cold overnight temperatures, he and his son completed the soybean harvest from the last of his fields and that this was the source of the beans that he delivered on that day to the Hague Elevator. (Id.).

The fact that Herr had made these statement was not communicated to Judge Narum when Husby swore out the criminal complaint. Rather, based on Husby's testimony, Judge Narum was left with the impression that Herr had unequivocally admitted he had completed the harvest of his soybean acreage on the 27th.

A jury could conclude this misrepresentation of Herr's position was not only Husby's fault but also Zylstra's as well. While Zylstra forwarded to Husby and the State's Attorney recordings of all of her conversations with Herr, she (1) prepared and forwarded a written summary of only the first call, and (2) did not explicitly alert either Husby or the State's Attorney that they needed to listen to the rest of the calls because what was written in the summary of the first call did not fully reflect what Herr had actually had to say about this and other matters. Further, in her written summary, Zylstra put in italics what Herr had purportedly stated to her about what he might have stated during the November 2014 call knowing full well that Herr said more than that after he had reviewed his records. A jury could reasonably conclude from this that Zylstra was not simply reporting facts as she had gathered them but rather had become a cheerleader for the bringing of criminal charges and was disingenuous in the manner in which she presented the results of her "investigation."

In summary, a jury could conclude there never was any real basis in fact for Husby's claim

that Herr had completed his soybean harvest on October 27.[10]  Also, short of that, a jury could conclude that Husby recklessly (if not intentionally) caused Judge Narum to be misled to the extent that he was left with the impression there was no dispute about this issue, and that Zylstra's conduct contributed to that.

### 3. Husby's recounting of what his hired hand claims to have seen on October 28

Husby also claimed during his *ex parte* testimony that Cornhusker's hired hand, Miles Grein, had seen a truckload full of beans parked in Herr's yard around noon on the 28th.  According to Husby, Grein claimed that, even though Herr advised him that those soybeans were his, Grein believed otherwise since the beans were in the truck that Herr had used to haul a load of Cornhusker soybeans that were delivered on the morning of the 28th and deposited in Cornhusker's name. Husby claimed that the truckload of beans that Grein claims to have seen parked in Herr's yard on the 28th must have come from Cornhusker's acreage (although Grein had no firsthand knowledge of that even assuming he saw this truck on that date and that it was full of soybeans) and was the load that was eventually delivered by Herr on October 30 to the Hague elevator.  (Doc. No. 41-3, pp. 9-11).

Here, there is sufficient evidence from which a jury could conclude, as Judge Narum concluded,  that this evidence was too speculative to support a finding of probable cause because the more direct evidence (that Cornhusker had in its possession and failed to disclose) supported a conclusion that there were no missing soybeans, much less that the October 30 load of beans was

---

[10]  There is also evidence  that Husby could not in good faith have relied upon Grein for his assertion that Herr had completed the harvest of his beans by October 27.  Grein was not out there on the 27th or the 30th.  (Doc. No. 43, Grein call).  Further, there is no evidence that he personally inspected all of Herr's soybean acreage when he was there on the 28th - particularly the gumbo fields located several miles away from the Cornhusker acreage.  Finally, Grein told Zylstra during his interview that he was not sure when Herr finished the harvesting of his soybeans.  (Doc. No. 43, Grein interview at ~ 00:16:40, ~ 00:45:00).

the load purportedly seen by Grein in Herr's yard on the 28th, if he even saw such a load on that date. Also, apart from this, a jury could conclude after listening to the recording of Grein's interview that he simply is not a reliable witness due to his apparent difficulty in recalling certain events and the uncertainty he expressed at times as to what actually had taken place. In fact, BCI Agent Kelly noted during his preliminary hearing testimony that, at least initially, Grein appeared to have been similarly confused. (Doc No. 32, pp. 39, 52-57). In addition, there is evidence that Grein had an axe to grind with Herr. (Doc. No. 43, Grein call). For these reasons alone, a jury could conclude that Husby and Grein's joint animus of Herr led to their stacking one bit of speculation and surmise upon another and that Grein's professed recollection was at best simply confabulation.

### 4. Herr's purported admission of guilt

Another point that Husby offered during his *ex parte* testimony in support of the complaint was that Herr had offered to forgo collection on his 2014 spaying bill in exchange for Cornhusker not pursing criminal charges. While Husby at one point did state that Herr had claimed he was innocent of any theft, he clearly implied that the offer to forgo receipt of payment on the spraying bill was evidence that Herr was guilty, *i.e.* a truly innocent person would not have done this. (Doc. No. 42-3, pp. 10-11). Judge Narum concluded at the end of the preliminary hearing after similar testimony was given that this was insufficient to move the needle towards a finding of probable cause. As set forth above, he concluded that a person in Herr's situation could come to the conclusion that, even though innocent, it was better to simply put matters behind him.

Further, there are at least two additional reasons why the jury might reach the same conclusion here. The first is what Herr explained to Zylstra during one or more of the April 7 phone conversations which was that he did not believe he was giving up much by forgoing the spraying bill since Cornhusker was refusing to pay it and his attorney had advised he could spend more than

what it was worth in attorney's fees in getting a judgment, not to mention trying to enforce it in South Dakota. The second reason is Zylstra's statements to Herr that his reputation would forever be damaged by the mere bringing of the criminal charge, even if he was able to later prove he was innocent. That is, the jury might conclude that forgoing a contested spraying bill might be a small price to pay not to have to go through the criminal process and endanger one's reputation. Notable also is the fact Judge Narum was not aware of Herr's explanations for why he offered to forgo the spraying bill or the degree of pressure that Cornhusker and Zylstra had placed upon Herr when he allowed the complaint to go forward following Husby's *ex parte* testimony.

## II.    ZYLSTRA'S MOTION FOR SUMMARY JUDGMENT

Zylstra argues it is entitled to summary judgment as to each of Herr's causes of action as a matter of law. Herr disagrees and argues summary judgment is inappropriate because disputed issues of material fact exist as to issues contained within each of his causes of action.

### A.    Negligence

Zylstra argues it is entitled to summary judgment as to Herr's negligence claim because Zylstra did not owe any duty to Herr. Herr argues summary judgment is inappropriate because Zylstra had a duty to uphold the code of ethics governing the conduct of private investigators in North Dakota. Thus, as presented in the current motion, the court must decide whether Zylstra owed any duty to Herr in conducting its investigation.

The court has not found, nor have the parties cited, a North Dakota Supreme Court decision on whether a private investigator owes a third-party investigatee a duty to conduct a competent investigation under North Dakota law.[11]   The North Dakota Supreme Court has said: "'Duty is

---

[11]The parties have not suggested the law of some state other than North Dakota applies to this action.

essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person.'. . . Whether the relation between two parties is such that it gives rise to a duty is a question of law for the court to decide." Azure v. Belcourt Public School Dist., 2004 ND 128, ¶ 10, 681 N.W.2d 816 (quoting 57A Am. Jur. 2d. Negligence § 89 (1989 & Supp. 2002)).

Herr bases his argument about a duty existing between Zylstra and himself on the code of ethics for private investigators. The North Dakota Private Investigation and Security Board has the power to "regulat[e] persons providing private investigative and security services" within North Dakota. N.D.C.C. § 43-30-04. Within that province, the "board may either refuse to renew, suspend, revoke, or place on probationary status any licensee, or issue a letter or reprimand for . . .: (8) Unprofessional conduct . . . ." N.D. Admin. Code § 93-02-03-05(8). The administrative code defines "unprofessional conduct" as including a violation of the code of ethics promulgated at N.D. Admin. Code § 93-02-03-05.1. This code of ethics, speaking broadly, requires private investigators to conduct themselves with professionalism and to deal justly with all persons.

The court is not convinced this code of ethics creates a duty between a private investigator and the persons whom they investigate. In other contexts, the North Dakota Supreme Court has not allowed an aggrieved party to use a professional code of conduct as a basis for establishing civil liability. Nesvig v. Nesvig, 2004 ND 37, ¶ 23, 676 N.W.2d 73 (stating the N.D. R. Prof. Conduct "are designed to provide guidance to lawyers and a structure for regulating conduct through disciplinary agencies, and they are not intended to be a basis for civil liability."). This is so because professional codes of conduct are only intended to regulate professions through professionally accepted standards. See id.; Schatz v. Rosenberg, 943 F.2d 485, 492 (4th Cir. 1991) (stating "ethical rules were intended by their drafters to regulate the conduct of the profession, not to create

actionable duties in favor of third parties"); <u>Bickel v. Mackie</u>, 447 F. Supp. 1376, 1383 (N.D. Iowa 1978) <u>aff'd</u> 590 F.2d 341 (8th Cir. 1983) (stating an attorney's violation of the rules of professional conduct "is not tantamount to a tortious act, particularly with regard to liability to a non-client."). Simply because a professional's conduct may constitute grounds for professional discipline, <u>cf.</u> <u>In re Disciplinary Action Against McKechnie</u>, 2003 ND 22, ¶ 16, 656 N.W.2d 661 (stating "the rules of professional conduct set a minimum level of conduct with the consequence of disciplinary action . . . ."), does not mean civil liability necessarily follows. <u>Nesvig</u>, at ¶ 23.

The court concludes such principles are applicable here. The regulatory framework codified at N.D.C.C. ch. 43-30 and N.D. Admin. Code tit. 93 governs the conduct of private investigators, a violation of which would provide grounds for professional discipline. Nothing within this framework, however, suggests these regulations impose a legal duty on private investigators that might give rise to civil liability. <u>Nesvig</u>, at ¶ 23; <u>see also</u> 26B C.J.S. <u>Detectives</u> § 10 (stating private investigators "have a duty to provide their services only to those with whom they have agreed to provide such services and to intended third-party beneficiaries to that agreement."). If the court were to find N.D. Admin. Code § 93-02-03-05.1 creates a duty on the part of a private investigator, it would, in essence, allow privatized enforcement of ethical rules better left for the appropriate disciplinary body---here, the North Dakota Board of Private Investigators. The court concludes Zylstra did not owe Herr a duty to uphold the code of ethics in conducting its investigation.

**B.      Intentional Infliction of Emotional Distress**

Zylstra argues it is entitled to summary judgment as to Herr's intentional infliction of emotional distress claim because its conduct cannot, even under a construction most favorable to Herr, be considered extreme or outrageous. Herr argues summary judgment is inappropriate because issues of material fact exist as to whether Zylstra's conduct can be considered extreme or

outrageous.

The North Dakota Supreme Court most recently outlined the tort of intentional infliction of emotional distress in Hysjulien v. Hill Top Home of Comfort, Inc., 2013 ND 38, 827 N.W.2d 533:

> In Muchow v. Lindblad, 435 N.W.2d 918, 923–25 (N.D.1989), this Court recognized a cause of action for the intentional infliction of emotional distress under Restatement (Second) of Torts § 46 (1965), requiring proof of "(1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress." "The 'extreme and outrageous' threshold is narrowly limited to conduct that exceeds 'all possible bounds of decency' and which would arouse resentment against the actor and lead to an exclamation of " 'outrageous' " by an average member of the community." Hougum v. Valley Memorial Homes, 1998 ND 24, ¶ 26, 574 N.W.2d 812. In G.K.T. v. T.L.T., 2011 ND 115, ¶ 17, 798 N.W.2d 872, this Court reiterated that "Muchow and its progeny repeatedly emphasize the strenuously high, 'all possible bounds of decency' standard." Hysjulien, at ¶ 40.

With respect to the extreme or outrageous conduct prong, the court further observed:

> Whether the alleged actions meet the threshold of extreme and outrageous conduct is a question of law to be decided by the court. Dahlberg v. Lutheran Soc. Servs., 2001 ND 73, ¶ 21, 625 N.W.2d 241. Thus, "[t]he court must initially decide whether a defendant's conduct reasonably may be regarded as 'extreme and outrageous.' " Hougum, 1998 ND 24, ¶ 26, 574 N.W.2d 812. However, "[i]f reasonable persons could differ, a plaintiff is entitled to have the trier-of-fact decide whether the conduct is sufficiently extreme and outrageous to result in liability." Dahlberg, at ¶ 21.

Hysjulien, at ¶ 41. Elaborating further, the court has said:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt.

Dahlberg, at ¶ 20 (quoting Restatement (Second) Torts § 46 cmt. d).

As presented in his briefing, Herr bases his intentional infliction of emotional distress claim on his multiple conversations with Zylstra, during which Herr alleges Zylstra engaged in "acts of coercion, extortion, and bullying" that extended "beyond the bounds of decency . . . ." (Docket No. 63 p. 15). Herr alleges this conduct was all the more egregious because of Laura Zylstra's past experiences as a special investigator and her legal training.

Viewing the evidence most favorably to Herr, Zylstra's conduct does not as a matter of law constitute the "extreme" or "outrageous" conduct required to support a claim for intentional infliction of emotional distress claim. Cf. Dahlberg, at ¶ 20 (stating "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not necessarily rise to the level of extreme or outrageous conduct). The North Dakota Supreme Court has concluded investigations conducted far more egregiously than that at issue here have not risen to the level necessary to maintain a claim for intentional infliction of emotional distress. See Muchow, 435 N.W.2d 924-25. On this record, no reasonable person could conclude Zylstra's conduct was "extreme" or "outrageous." Based on the foregoing, the court **GRANTS** Zylstra's motion for summary judgment as to Herr's claim for intentional infliction of emotional distress.

## C.    Abuse of Process

The North Dakota Supreme Court recently outlined the tort for abuse of process as follows:

> An "[a]buse of process occurs when a person uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." The two essential elements of an abuse-of-process claim are: (1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding. In cases involving abuse-of-process claims, our decisions require some overt act akin to extortion or attempting to obtain a collateral advantage beyond the issuance of the formal use of process.

Riemers v. Hill, 2016 ND 137, ¶ 22, 881 N.W.2d 624 (quoting Jordet v. Jordet, 2015 ND 76, ¶ 20, 861 N.W.2d 147). While some jurisdictions take the position that only conduct engaged in after the

process is issued is actionable,[12] that is not the law in North Dakota. The North Dakota Supreme Court has adopted Dean Prosser's view that conduct prior to the criminal process being issued can give rise to a claim for abuse of process. Riemers, at ¶ 23; Stoner v. Nash Finch, Inc., 446 N.W.2d 747, 752 (N.D. 1989) ("Stoner'); see Prosser and Keeton, The Law of Torts § 121, p. 898 (5th ed. 1984) ("Prosser and Keeton"). Also, what is *not* an element for the tort of abuse of process is showing lack of probable cause. Consequently, even if it should ultimately be concluded that there was probable cause for the criminal complaint signed by Husby and that Herr's malicious prosecution claim fails for this reason, that is *not* a defense to the claim of abuse of process. See id.

Zylstra's primary argument for why Herr has no claim of abuse of process is her contention that merely informing Herr that Cornhusker would proceed with criminal charges if he did not make amends does not constitute abuse of process. This is because the criminal laws exist not only to punish the guilty but also to provide, when appropriate, restitution to victims. Therefore, according to Zylstra, telling Herr that criminal charges might be sought if payment was not made is using the process to accomplish a purpose for which it was designed. Consequently, according to Zylstra, there can be no liability for abuse of process, even if her motives for making the communications she did were less than pure.

While these arguments may have some force in jurisdictions where the definition of abuse of process is narrower, it is an abuse of process in North Dakota to use the threat or club of the criminal process in manner that amounts to a form of extortion; that is, "it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." E.g., Riemers, at ¶ 23 (quoting prior North Dakota cases); Stoner, 446 N.W.2d

---

[12] See, e.g., South Arkansas Petroleum Co. v. Schlesser, 36 S.W.3d 317, 323-24 (Ark. 2001); Miessner v. All Dakota Ins. Associates, Inc., 515 N.W.2d 198, 204-05 (S.D. 1994); Packard v. Central Maine Power Co., 477 A.2d 264, 267-68 (Me. 1984).

at 751(quoting Prosser and Keeton at § 121, p.898); <u>see</u> <u>also</u> <u>Mullins v. Sanders</u>, 54 S.E.2d 116 (Va. 1949) (it is an abuse of the criminal process to use it as "means of oppression" and "whip" to force payment of an indebtedness).

In this case, there are disputed issues of material fact as to whether Zylstra's communications with Herr constituted impermissible coercion given the circumstances and the manner in which the communications were made. This includes the evidence discussed earlier of: the short deadline given to Herr to respond; the repeated mentioning of the sheriff being aware of the situation; the communication that, from Zylstra's perspective as a trained criminal investigator, things looked bad for Herr; the conveying of the seriousness of the potential criminal penalties; the threat of criminal charges extending beyond a charge for the alleged theft of the beans; and the mentioning of the embarrassment that Herr would suffer and the lasting damage to his reputation, even if he was to later prove his innocence.

Moreover, even under a narrower definition of abuse of process, there is evidence that a jury could conclude that Cornhusker's primary purpose for threatening criminal prosecution was to avoid the consequences of the 2014 spraying bill and that Zylstra knowingly assisted in that effort. Also, there were the threats that the criminal process would be used to reexamine all of the dealings between Cornhusker and Herr with the possibility of additional felony charges if payment was not made for the October 30 load of soybeans.

## D. Malicious Prosecution

As described by the North Dakota Supreme Court, the elements of malicious prosecution are: "(1) Institution of a criminal proceeding by the defendant against the plaintiff; (2) Termination of the criminal proceeding in favor of the accused; (3) Absence of probable cause for the criminal proceeding; and (4) Malice." <u>Kummer v. City of Fargo</u>, 516 N.W.2d 294, 298 (N.D. 1994). Zylstra

argues it is entitled to summary judgment as to Herr's malicious prosecution claim because: (1) it did not institute criminal proceedings against Herr; (2) the court found probable cause existed to support the prosecution; and (3) Zylstra did not act maliciously. Herr argues summary judgment is inappropriate because Zylstra either misapplies/misinterprets the law and/or there are disputed issues of material fact as to this claim precluding summary judgment.

### 1. Institution of criminal proceeding

"Institution of criminal proceedings for the tort of malicious prosecution involves taking some active part in instigating or encouraging the prosecution, as by advising or assisting another person to begin the proceeding, or taking any active part in directing or aiding the conduct of the case." Larson v. Baer, 418 N.W.2d 282, 287 (N.D. 1988). A party is not regarded as having instituted a criminal proceeding by "merely stat[ing] to the authorities what he believes to be true and leaves the decision to prosecute entirely to the uncontrolled discretion of the officer . . . ." Id. Under the independent investigation rule, "when the prosecuting authority acts upon an independent investigation of his own, instead of on the information supplied by the party making the complaint, the latter has not caused the prosecution and cannot be held liable in an action for malicious prosecution." Id. This requires the plaintiff alleging malicious prosecution to "establish that the defendant was a proximate cause of plaintiff's prosecution." Id. Whether the defendant's actions rise to this level is a question of fact. Id.

Zylstra claims that it can have no liability for malicious prosecution because, according to it, the decision on whether to prosecute Herr was made by the McIntosh State's Attorney, along with possibly input from the Sheriff, and only after BCI had conducted an independent investigation. The problem with this, however, is that the criminal complaint was signed by Husby (albeit with the endorsement of the State's Attorney), the affidavit in support of the complaint was Husby's, and the

only evidence offered in support of the complaint when Judge Narum found the affidavit to be insufficient was Husby's *ex parte* testimony; the BCI had no direct involvement in any of that. While a jury might conclude, just as Zylstra claims, that she did nothing more than turn over to Husby and the State's Attorney her work product, there is more than enough evidence from which a jury could conclude that her involvement went beyond that and what Zylstra included in her reports or failed to include with respect to the points discussed earlier was material to some of the testimony that Husby gave during the *ex parte* proceeding as well upon the State's Attorney's decision to endorse the complaint that Husby signed.  See Larson, 418 N.W.2d at 288 (concluding "[w]hether Henke's investigation and State's Attorney Orvik's decision to prosecute were independent of Baer's influence, and whether Baer was a proximate cause of the Brunnemeyers' prosecutions, are questions of fact to be decided by the fact finder.").

### 2. Existence of probable cause

Zylstra next argues summary judgment is appropriate because Judge Narum initially found probable cause existed to support the criminal complaint based upon Husby's *ex parte* testimony. Putting aside the fact that Judge Narum later came to the contrary conclusion at the end of the preliminary hearing, a finding of probable cause by Judge Narum would not provide an absolute defense in any event.  In Richmond v. Haney, 480 N.W.2d 751 (N.D. 1992) ("Richmond"), the North Dakota Supreme Court stated the following:

> When there has been a prior judicial determination of probable cause, such a finding usually constitutes prima facie evidence of probable cause in a subsequent malicious prosecution suit. See Weisenberger v. Mueller, 89 N.W.2d 559, 564 (N.D.1958); see also Watkins v. Spring Creek Colony, 188 Mont. 467, 614 P.2d 508, 510 (1980); 54 C.J.S., Malicious Prosecution, section 32 (1987). Generally, to defeat such a determination, the acts or omissions of the defendant must have tainted the proceeding or the evidence considered in the proceeding. See generally Wigger v. McKee, 809 P.2d 999, 1005 (Colo.App.1990).

Id. at 755; see also Rhodes v. Smithers, 939 F. Supp. 1256, 1273 (S.D.W.Va.1995) (a person can

be held liable for malicious prosecution if he or she "fail[s] to disclose exculpatory evidence to prosecutors, make[s] false or misleading reports to the prosecutor, omit[s] material information from the reports, or otherwise interfere[s] with the prosecutor's ability to exercise independent judgment.") (citing cases), <u>aff'd</u>, 91 F.3d 132, 1996 WL 420471 (4th Cir.1996); <u>Dick v. Watonwan County</u>, 562 F. Supp. 1083, 1100 (D. Minn. 1983), <u>reversed on other grounds</u>, 738 F.2d 939 (8th Cir. 1984) (judge's determination of probable cause that was the product of affidavits containing glaring misstatements and unverified information did not break the chain of causation and provide insulation from liability);

Here, as outlined earlier, there is sufficient evidence from which a conclusion could be drawn that the failure of Husby and Zylstra to bring to the forefront information they had in their possession as well as Husby giving misleading, if not outright false testimony, "tainted the proceeding or the evidence considered in the proceeding" and resulted in Judge Narum erroneously concluding that probable cause existed based on Husby's *ex parte* testimony. Finally, as outlined earlier, there is sufficient evidence from which a jury could conclude that probable cause was lacking independent of any determination by Judge Narum.

### 3.   Malice

Zylstra finally argues it is entitled to summary judgment because Herr has not provided any evidence establishing Zylstra acted with malice.  In <u>Kummer v. City of Fargo</u>, 516 N.W.2d 294 (N.D. 1994), the North Dakota Supreme Court defined "malice" for purposes of a malicious prosecution action as follows:

> "Malice" is defined as " 'a primary purpose other than that of bringing an offender to justice.' " <u>Richmond</u>, <u>supra</u>, 480 N.W.2d at 755 (quoting Prosser & Keeton, <u>supra</u>, at 871). Thus, "malice" for purposes of a malicious prosecution action is essentially synonymous with the element of "ulterior purpose" in abuse of process. <u>See</u> Prosser & Keeton, <u>supra</u>, at 898 ("the two torts have the common element of an improper

purpose in the use of legal process").

Id. at 298.  While malice can be shown by evidence of "actual malevolence or corrupt design," that is not essential.  Kolka v. Jones, 71 N.W. 588, 562 (N.D. 1897).  Also, in some cases, "malice may be inferred by a jury from want of probable cause."  Id.

Here, there is sufficient evidence from which a jury could conclude that certain of Zylstra's questionable acts and omissions as discussed above were undertaken not for the primary purpose of "bringing an offender to justice," but rather to satisfy the demands of her client for whatever personal gain that may have been for her, either with respect to this matter or in attracting future business.  And, while that alone might not be enough to establish malice for a person in Zylstra's situation, it would be enough under North Dakota law if at the same time she acted recklessly and in a callous disregard of whether or there was existed probably cause to support a criminal charge against Herr.  See Richmond, 480 N.W.2d at 755 n.4; cf. Kummer, 516 N.W.2d at 298 (stating that without more the  use of "[o]verzealous police techniques" by a law enforcement officer would not be enough to constitute malice).   In this case, a jury could (but would not be required to) conclude that Zylstra acted recklessly and in wanton disregard of Herr's right not to be subject to criminal process lacking in probable cause.

## III.    HERR'S MOTION TO AMEND TO REQUEST PUNITIVE DAMAGES

N.D.C.C. § 32–03.2–11(1) governs the pleading of a request for punitive damages in North Dakota cases. This court has previously construed this statute as providing substantive rights and has applied it in diversity cases when punitive damages are sought for state law claims. E.g., Atkinson v. McLaughlin, No. 1:03–cv–091, 2007 WL 557024, at *7 (D.N.D. Feb. 15, 2007) (citing other cases) ("Atkinson ").

In this case, Herr has made out a prima facie case as to each defendant for abuse of process

and malicious prosecution - intentional torts that often provide the basis for an award of punitive damages. Restatement (First) of Torts § 908 cmt. *c* (stating "in torts which, like malicious prosecution, require a particular anti-social state of mind, the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages."). After careful review, the court concludes the evidence outlined above is sufficient to support a finding by a preponderance of the evidence of one or more of the elements of oppression, fraud, or malice required for an award of punitive damages under North Dakota law if the jury chooses to believe that evidence and not believe other evidence. This satisfies § 32–03.2–11(1)'s requirements as previously applied by this court. E.g., Atkinson, 2007 WL 557024 at *8 (holding plaintiff was required under § 32–03.2–11(1) to demonstrate "that there is a factual basis for a claim of punitive damages and whether there is sufficient evidence to support a finding by the trier of fact that a preponderance of the evidence proves oppression, fraud, or actual malice" and plaintiff was not required to prove his or her claim because "[t]o require so would usurp the fact-finding province of the trier of fact"); Olson v. Ford Motor Co., Civ. No. A4–04–102, 2005 WL 3271945, at **2–3 (D.N.D. Nov. 29, 2005) (same); see also Mosley v. Alpha Oil and Gas Services, Inc., 962 F. Supp. 2d 1090, 1105 (D.N.D. 2013).

## IV.   CONCLUSION

Based on the forgoing, the court:

1.     **GRANTS IN PART** Zylstra's motion for summary judgment (Doc. No. 39) as to Herr's claims for negligence and intentional infliction of emotional distress against Zylstra.  Those claims are **DISMISSED**.

2.     The court **DENIES IN PART** Zylstra's motion for summary judgment with respect to Herr's abuse of process and malicious prosecution claims.  Those claims are not

dismissed.

3.      The court **GRANTS** Herr's motion to amend his complaint (Doc. No. 28) to include a request for punitive damages. **Herr shall file and serve the proposed amended complaint within 10 days**.

**IT IS SO ORDERED.**

Dated this 27th day of March, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court